# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

## No. ACM 40131 (f rev)

———————————

## UNITED STATES
*Appellee*

v.

## John F. STAFFORD III
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 30 November 2023

———————————

*Military Judge*: Rebecca E. Schmidt; Dayle P. Percle (remand).

*Sentence*: Sentence adjudged 13 March 2021 by GCM convened at Mountain Home Air Force Base, Idaho. Sentence entered by military judge on 12 April 2021: Dishonorable discharge, confinement for 18 years and 6 months, and reduction to E-1.

*For Appellant*: Major Kasey W. Hawkins, USAF; Major Frederick J. Johnson, USAF; Catherine M. Cherkasky, Esquire.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Major Morgan R. Christie, USAF; Major Deepa M. Patel, USAF; Major Brittany M. Speirs, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, CADOTTE, and ANNEXSTAD, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge CADOTTE and Senior Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

JOHNSON, Chief Judge:

A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of four specifications of rape, one specification of attempted sexual assault, one specification of aggravated assault, and two specifications of assault consummated by a battery in violation of Articles 120, 80, and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 880, 928.[1,2] The court members sentenced Appellant to a dishonorable discharge, confinement for 18 years and 6 months, and reduction to the grade of E-1. The convening authority approved the sentence but waived automatic forfeitures for six months, or until release from confinement or expiration of Appellant's term of service, for the benefit of Appellant's dependent child pursuant to Article 58b(b), UCMJ, 10 U.S.C. § 858b(b).

Appellant initially raised the following issues on appeal: (1) whether the court-martial lacked jurisdiction over Appellant; (2) whether Appellant's convictions were legally and factually sufficient; (3) whether the military judge abused her discretion by failing to abate the proceedings due to the loss or destruction of evidence; (4) whether the military judge abused her discretion by failing to declare a mistrial after improper testimony from two witnesses; (5) whether Appellant was denied a constitutional right to a unanimous verdict; (6) whether the record of trial is incomplete; (7) whether Appellant's sentence is inappropriately severe; (8) whether the mandatory dishonorable discharge violates Appellant's constitutional rights; and (9) whether the court-martial proceedings violated various jury trial rights granted to Appellant by the

---

[1] Unless otherwise noted, references to Article 120, UCMJ, are to the *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*); references to Articles 80 and 128, UCMJ, are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise noted, all other references to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The court members excepted certain language from one of the Article 120, UCMJ, specifications, finding Appellant not guilty of the excepted language but guilty of the remainder of the specification. They found Appellant not guilty of one specification of assault consummated by a battery in violation of Article 128, UCMJ.

Fifth,[3] Sixth,[4] Ninth,[5] and Fourteenth Amendments.[6,7] With respect to issue (6), the Government conceded four appellate exhibits were missing from the record of trial, and this court additionally found—as Appellant alleged—two pages were missing from the Preliminary Hearing Officer's report. We ordered the record be remanded to the Chief Trial Judge, Air Force Trial Judiciary, for return to the military judge for correction of the record pursuant to Rule for Courts-Martial (R.C.M.) 1112(d)(2). *United States v. Stafford*, No. ACM 40131, 2022 CCA LEXIS 654 (A.F. Ct. Crim. App. 8 Nov. 2022) (order).

The record of trial was subsequently re-docketed with the court with the missing material added via a certificate of correction. After re-docketing, Appellant submitted a brief providing additional argument with respect to issues (1) and (3) and raising three additional issues: (10) whether the military judge abused her discretion admitting evidence pursuant to Military Rule of Evidence (Mil. R. Evid.) 413; (11) whether Appellant was denied effective assistance of counsel by trial defense counsel's failure to file a motion regarding the right to a unanimous verdict; and (12) whether the conditions of Appellant's confinement subjected him to cruel and unusual punishment in violation of the Eighth Amendment[8] and Article 55, UCMJ, 10 U.S.C. § 855.[9] In addition, although not raised as an assignment of error, we consider whether Appellant is entitled to relief for unreasonable appellate delay.

Issue (6) has been resolved through our prior remand and the certificate of correction. We have carefully considered issues (5), (8), (9), and (11), and find they do not require discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

---

[3] U.S. CONST. amend. V.

[4] U.S. CONST. amend. VI.

[5] U.S. CONST. amend. IX.

[6] U.S. CONST. amend. XIV.

[7] We have reordered and consolidated some of these issues. Appellant personally raised issues (2) (in part), (4) (in part), (7), (8), and (9) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[8] U.S. CONST. amend. VIII.

[9] Appellant personally raised issues (10), (11), and (12) pursuant to *Grostefon*, 12 M.J. 431.

## I. BACKGROUND

The following background information is drawn primarily from the court-martial testimony of CM, SK, and HG.

### A. CM

Appellant and CM married in December 2007. Appellant enlisted in the Air Force in March 2008, and CM traveled with Appellant to his first duty assignment at Spangdahlem Air Base, Germany. Appellant and CM lived together in Germany for approximately three years and had two children together. In 2012, Appellant was transferred to Mountain Home Air Force Base (AFB), Idaho. Appellant and CM lived together with their two daughters in Idaho.

In June 2012, Appellant and CM were alone at home when they got into an argument and Appellant became angry. Appellant, who was much larger and stronger than CM, grabbed her by the back of the neck, guided her to the top of a staircase, and pinned her to the floor. Appellant unbuttoned CM's pants. CM feared Appellant was going to sexually assault her and said, "[P]lease don't do this." Appellant responded, "[N]o, it's happening." He held CM down by her wrists and penetrated her vagina with his penis. As he did so, he made comments such as, "I guess it's over then, huh," "you're never gonna [sic] stay with me after this," and "[w]e'll never come back from this," or words to that effect. CM was crying and asking Appellant to stop, which he eventually did. Appellant then apologized and made comments such as, "I'll do anything," "I'll go to counseling," "I'll make this work," and "I'll change."

Appellant and CM remained married for a time. Appellant deployed in approximately March 2013. While Appellant was deployed, he told CM he wanted a divorce. Appellant and CM divorced in November 2013, approximately one month after Appellant returned from his deployment. Thereafter, Appellant and CM lived in separate residences in Mountain Home, Idaho; they shared custody of their two daughters, with CM having primary custody. From time to time, Appellant would express interest in reconciling with CM, and they would exchange flirtatious or affectionate messages; but at other times Appellant indicated he did not want to reconcile or just avoided communicating with her. Occasionally they would engage in consensual sexual intercourse.

In January 2014, while the daughters were staying with Appellant, CM went to Appellant's house to bring an item for one of the children. CM stepped inside the house to see a toy one of the children had received for Christmas. Appellant hugged CM, then tightened his grip and told her, "[G]et upstairs now." CM told Appellant "please don't do this" and to "just let [her] leave." Appellant responded, "[N]ope, you're done . . . get upstairs now and [the

4

children] won't know about it." CM went up the stairs and Appellant pushed her into the master bedroom and locked the door. Appellant then "pressed [CM] down on the bed" and held her down by her wrists or arms as he first penetrated her vagina and then her anus with his penis. CM heard the two daughters knocking on the bedroom door, attempting to turn the door handle and calling to Appellant and CM. CM asked Appellant to stop and to let her go to the children. Appellant told CM to "shut up" and grabbed her hair. Appellant ejaculated on CM's back, said she was "disgusting," and told her to leave.

Appellant and CM continued to communicate and share custody of the children. In February 2014, CM drove to Appellant's house on her way home from work with her children in her car to deliver something to Appellant. When Appellant answered the door, he told CM he was "sorry for how things have been." Appellant then grabbed CM by the wrist, pulled her into the house, and shut and locked the front door. CM told Appellant the children were "outside," to which Appellant responded, "[I]t's fine . . . [t]his won't take long." Appellant then pulled CM down onto a pile of laundry and penetrated her vagina with his penis, despite CM telling him "please, don't do this" and repeating that "[t]he kids are outside." After "about [five] minutes," Appellant stopped and told CM, "I don't even want to have sex with you. You're disgusting. Get out of here." Appellant got off CM, who pulled up her pants and left the house.

After this incident, CM stopped having consensual sexual intercourse with Appellant. CM also told Appellant that she "couldn't trust him" and would no longer meet him at his house.

One evening in March 2014, CM was standing in the kitchen of her house when Appellant unexpectedly walked in through an unlocked door. CM's daughters were sleeping in their bedrooms. Appellant was angry from an incident earlier in the day when CM did not want to sit with him at a church service. CM attempted to apologize but Appellant responded "nope, you're done," and picked up a knife. Appellant pointed the knife at CM and told her to go into the bedroom, which CM did. Once inside, Appellant told CM to remove her clothing, which she did. Appellant then penetrated CM's vagina and anus with his penis, at one point taking pictures of CM with his phone and laughing at her. CM estimated this incident lasted an hour or longer.

In September 2014, CM alleged that on or about 21 September 2014 Appellant raped her and threatened her with a knife in her home. Unlike the prior incidents, CM reported this incident to civilian authorities. The State of Idaho prosecuted Appellant for rape and aggravated assault for the September 2014 incident, but not for any other alleged offense against CM. In June 2015, a jury found Appellant not guilty of both charges.

After a child custody hearing in 2015, Appellant surrendered his parental rights to the children. CM married again in 2019, and CM's new husband adopted the children.

## B. SK

SK met Appellant in 2014, when she was 19 years old. SK was originally from Idaho but attended college in North Carolina. By 2015, SK and Appellant were in a long-distance relationship. In 2016, SK transferred to a university in Idaho for her senior year. SK initially lived with her parents in Boise, Idaho, but moved in with Appellant in Mountain Home in 2017.

In the spring of 2017, Appellant and SK got into an argument which turned violent. Appellant grabbed SK by the neck and held her against a wall, strangling her. Appellant then pushed SK onto a bed and continued strangling her. SK managed to get off the bed and go into another room, but Appellant caught her and began strangling her again until she blacked out. When SK awoke, she got up from the floor and tried to run to the bathroom, but Appellant tackled her, knocking her to the floor again. Appellant then let SK up and they continued arguing. SK stayed with Appellant and slept in the house that night.

In July 2017, during an evening out with friends, Appellant and SK got into an argument over a message SK found on Appellant's phone. The argument continued intermittently throughout the evening until, as Appellant and SK stood outside the apartment of their friend Staff Sergeant (SSgt) AZ, it turned physical. Appellant grabbed SK by the neck and started strangling her. Appellant squeezed SK's neck until she felt dizzy and had difficulty breathing. SK "started fighting back . . . as hard as [she] could," and screamed for help. The apartment door opened and one of SK's friends, RD, stepped outside, at which point Appellant let go of SK and stepped back. Appellant went into the apartment where SSgt AZ was, while SK went for a walk with RD. RD asked SK if she wanted to call the police; SK told RD no. Appellant and SK spent the night at the apartment with RD and SSgt AZ, although in separate rooms. The following morning, SK's jaw was swollen and sore. According to SK, Appellant later admitted to her that he had punched her in the face inside the apartment that night, but SK had no memory of that.

In the fall of 2017, Appellant and SK got into another argument at their house. When SK went into the bedroom to go to bed, Appellant followed her into the bedroom and began arguing again. Appellant pinned SK to the bed and told her, "I'm going to have you one last time," and tried to remove her pants. SK told Appellant "no" and tried to push him off. Appellant began strangling SK while continuing to try to remove her pants, which he succeeded in unbuttoning but could not pull off. Eventually Appellant gave up and got off

SK, and the argument resumed. Appellant went into the kitchen, picked up a knife, and threatened to kill himself.

SK continued to live with Appellant until 2018, when she moved back in with her parents. By the time of Appellant's trial in March 2021, she had married another man and was living in another state.

## C. HG

On a Friday night in August 2018,[10] HG and her friend M met Appellant and other Air Force members in a bar. HG and M agreed to go to Appellant's house "[t]o hang out with people." Because HG and M were intoxicated, Appellant drove M's car to his house. After they arrived, they were joined by Appellant's roommate TG and another friend of Appellant. HG denied flirting with Appellant or being interested in him sexually, although she was "kind of interested" in TG. Appellant invited HG to sleep in his bedroom, but HG told him no. Instead, she went to sleep in TG's room next to M and TG, wearing shorts and a t-shirt. HG woke up and found herself on a couch in the living room with Appellant behind her, and she could "feel him having sex with [her]." She had no memory of how she got to the couch. HG remembered Appellant put his penis in her vagina, but she did not remember anything else until she woke again a second time on the couch next to Appellant. HG was confused. She noticed her underwear was pulled partially down one leg, and her pants were pulled up. After talking with M, HG went to a hospital for a sexual assault examination, and she reported the alleged sexual assault the same day.

The State of Idaho prosecuted Appellant for the alleged rape of HG. In April 2019, a jury found Appellant not guilty of the charge.

## D. Appellant's Court-Martial Convictions

In March 2021, Appellant was convicted by a general court-martial on the following charges and specifications: four specifications of rape against CM occurring in June 2012, January 2014, February 2014, and March 2014 (Specifications 1 through 4 of the Additional Charge); one specification of attempted sexual assault against SK occurring in September or October 2017 (Specification of Charge I); one specification of aggravated assault against SK by strangling her with force likely to cause death or grievous bodily harm in July 2017 (Specification 1 of Charge II); one specification of assault consummated by battery against SK by tackling her between February and May 2017 (Specification 2 of Charge II); and one specification of assault consummated by battery

---

[10] HG's court-martial testimony was unclear as to when this incident occurred, but other documents in the record of trial place it in August 2018.

against SK by strangling her on divers occasions between February and October 2017 (Specification 3 of Charge II). The court-martial found Appellant not guilty of one specification of assault consummated by battery against SK by striking her on the jaw with his fist in July 2017 (Specification 4 of Charge II). Pursuant to Mil. R. Evid. 413, HG testified at Appellant's court-martial regarding the alleged sexual assault in August 2018 of which Appellant was acquitted in Idaho state court.

## II. DISCUSSION

### A. Jurisdiction

#### 1. Additional Background

On 19 February 2019, while Appellant's civilian trial for the August 2018 alleged rape of HG was pending, Appellant reached the expiration of his then-current enlistment. Appellant was also under investigation by the Air Force for the 2017 alleged assaults against SK. The Mountain Home AFB legal office delayed Appellant's separation by requesting he be placed on "administrative hold" because he was the "Subject of an Air Force Office of Special Investigations (AFOSI) investigation, with the possibility of a future court-martial." On 18 March 2019, the administrative hold was renewed on similar grounds.

On 21 and 22 March 2019, while the civilian trial was still pending, an administrative discharge board was convened and recommended Appellant be administratively discharged with an under other than honorable conditions (UOTHC) service characterization, the basis being the alleged rape of HG pending trial in civilian court. However, following the board, Air Force authorities took no further action to effectuate the administrative discharge, either before or after Appellant was acquitted of the alleged rape of HG in April 2019. Instead, Appellant's administrative hold was periodically renewed on the grounds that charges would likely be preferred against him as a result of the ongoing AFOSI investigation of SK's allegations.

On 30 October 2019, Appellant's squadron commander preferred the five specifications alleging offenses involving SK. The preliminary hearing officer submitted his report to the special court-martial convening authority on 28 January 2020. On 28 February 2020, the squadron commander preferred the four specifications alleging offenses involving CM. On 25 March 2020, the general court-martial convening authority referred the charges and specifications for trial by general court-martial. Appellant was arraigned on 27 April 2020. Appellant did not challenge the court-martial's jurisdiction over himself or the charged offenses prior to his appeal.

### 2. Law

We review questions of court-martial jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). Challenges to jurisdiction not raised at trial are not waived and may be raised for the first time on appeal. *See* R.C.M. 907(b)(1); *United States v. Reid*, 46 M.J. 236, 240 (C.A.A.F. 1997).

"Generally, there are three prerequisites that must be met for courts-martial jurisdiction to vest: (1) jurisdiction over the offense, (2) jurisdiction over the accused, and (3) a properly convened and composed court-martial." *United States v. Ali*, 71 M.J. 256, 261 (C.A.A.F. 2012) (citing R.C.M. 201(b); *United States v. Harmon*, 63 M.J. 98, 101 (C.A.A.F. 2006)). Jurisdiction over an accused is lost upon discharge from the service, but "the UCMJ does not state when a servicemember's discharge from the armed forces becomes effective for jurisdictional purposes." *United States v. Christensen*, 78 M.J. 1, 4 (C.A.A.F. 2018). "As a general matter, members of the armed forces do not have an unconditional right to be discharged upon" the expiration of their term of service, and "[t]he authority to retain servicemembers past their period of obligated service for purposes of trial by court-martial is a longstanding feature of military law." *Smith v. Vanderbush*, 47 M.J. 56, 57–58 (C.A.A.F. 1997).

The United States Court of Appeals for the Armed Forces (CAAF) "has identified three criteria to consider when determining whether a servicemember's discharge has been finalized for jurisdictional purposes: (1) the delivery of a discharge certificate (a DD Form 214); (2) a 'final accounting of pay'; and (3) the completion of the 'clearing' process that is required under service regulations." *Christensen*, 78 M.J. at 4 (quoting *United States v. Hart*, 66 M.J. 273, 276–79 (C.A.A.F. 2008)). However, this guidance is not binding when it goes "against reason or policy." *Id.* (quoting *United States v. Nettles*, 74 M.J. 289, 291 (C.A.A.F. 2015)). "[I]f one or more of these criteria have not been fully met, then the military trial judge must consider the totality of the circumstances in making a jurisdictional determination." *Id.* at 5 n.6 (citing *Nettles*, 74 M.J. at 291).

### 3. Analysis

Appellant asserts the court-martial lacked personal jurisdiction over him. However, Appellant does not claim any of CAAF's three criteria for a finalized discharge have been met in this case. Instead, Appellant essentially contends the Government's extension of his enlistment beyond 19 February 2019 for the "possibility of a future court-martial" was a subterfuge in order to administratively discharge him with a UOTHC service characterization. Appellant contends it was only after the state court acquitted him of the alleged rape of HG

that the Government began preparing in earnest to prosecute him. Appellant further suggests certain of the legal office's administrative hold requests were untimely or otherwise deficient in some respect.

We are not persuaded the court-martial lacked jurisdiction over Appellant. Although a lack of jurisdiction may be raised for the first time on appeal, it is telling that in this lengthy and highly contested court-martial, the Defense at no point asserted a lack of jurisdiction. Nothing in the record indicates Appellant obtained a DD Form 214, received a final accounting of pay, or completed a clearing process to depart his unit, Mountain Home AFB, or the Air Force. To the contrary, all trial participants behaved as if they understood Appellant remained on active duty with the Air Force.

The CAAF has held that these three criteria are not binding and that in the absence of one or more of them, depending on the totality of circumstances, a finding of personal jurisdiction may nevertheless be contrary to "reason or policy." *Id.* at 4 (citation omitted). This is not such a case. Appellant has not identified any prohibition on conducting an administrative discharge board while an Airman is on administrative hold pending the outcome of a criminal investigation; nor has Appellant demonstrated the result of the discharge board compelled the separation authorities to take any action while the criminal investigation continued. An arguably premature discharge board or discrepancies in certain administrative hold requests do not alter the evident reality that Appellant was not discharged prior to his court-martial.

## B. Legal and Factual Sufficiency

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001)

(citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The testimony of a single witness may be sufficient to meet the Government's burden to prove every element of an offense beyond a reasonable doubt "so long as the members find that the witness's testimony is relevant and is sufficiently credible." *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (citations omitted).

### 2. Analysis

Appellant challenges all the findings of guilty as legally and factually insufficient.[11] We address the sufficiency of the evidence with respect to the offenses against each victim, CM and SK, below.

#### *a. CM*

In order to convict Appellant of each specification of rape in violation of Article 120, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) Appellant committed a sexual act on CM, specifically penetrating her vulva with his penis; and (2) Appellant caused the sexual act by using unlawful force against CM. *See* 10 U.S.C. § 920(a)(1); *Manual for Courts-Martial, United States* (2012 ed.), pt. IV, ¶ 45.a.(a)(1).[12] The term "sexual act" includes,

---

[11] Except with respect to Specification 4 of the Additional Charge, alleging Appellant raped CM in March 2014, Appellant personally raises legal and factual sufficiency pursuant to *Grostefon*, 12 M.J. 431.

[12] Specification 1 of the Additional Charge alleges Appellant raped CM on or about 22 June 2012; Specifications 2, 3, and 4 of the Additional Charge allege offenses

*inter alia*, penetration of the vulva by the penis. 10 U.S.C. § 920(g)(1)(A). "Force" includes, *inter alia*, "the use of a weapon" or "the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person." 10 U.S.C. §§ 920(g)(5)(A), 920(g)(5)(B). "The term 'unlawful force' means an act of force done without legal justification or excuse." 10 U.S.C. § 920(g)(6).

The Government introduced sufficient evidence for the court members to find beyond a reasonable doubt, with respect to all four specifications of rape, that Appellant penetrated CM's vulva with his penis by using unlawful force against CM. CM testified that in each alleged instance Appellant penetrated her vulva with his penis by using unlawful force, such as by grabbing her by the neck and holding her down; pushing her onto a bed and holding her down; grabbing her by the wrist and pulling her into his house and onto a pile of laundry; and threatening CM with a knife. Based on CM's testimony, the court members could reasonably conclude from Appellant's use of force, his statements to CM, and his disregard of CM's statements indicating she did not consent, that Appellant accomplished the penetration by unlawful force. In addition, the Government introduced text messages between Appellant and CM wherein Appellant essentially acknowledged that he had "lied" to CM on at least one occasion when he promised to be "gentl[e]," and that he caused her to "live in a constant state of fear and tension." Most tellingly, when CM texted Appellant in the summer of 2014 that he had "raped" her twice "violently," Appellant responded, "I'd appreciate it if you stopped reminding me [o]f that. Trust me, I'll never forget what I did to you." Furthermore, the Government called two of CM's former neighbors who testified CM asked them to help fortify the doors and windows of her house and create a safety plan to help protect her from Appellant.

Appellant argues his convictions depend on the testimony of CM, and contends she is insufficiently credible for the court members to find the elements proven beyond a reasonable doubt. In particular, Appellant cites CM's text alleging Appellant had raped her "twice," rather than four times. He contends, "[t]herefore[,] by her own words in her text message to [Appellant] it is impossible for all four of the allegations contained in the Additional Charge to be

---

committed between on or about 5 January 2014 and on or about 5 March 2014. Thus Specification 1 was charged under the version of Article 120, UCMJ, in effect prior to 28 June 2012, which required the Government to prove Appellant "cause[d] [CM] to engage in a sexual act by[ ] using force against [CM]." *See* 2012 *MCM*, App. 28, at A28-1. The differences between the versions of Article 120, UCMJ, applicable to Specification 1 and Specifications 2, 3, and 4 of the Additional Charge are not material to our analysis of the instant case.

true." We find this argument thoroughly unconvincing. The fact that CM referred to two offenses in her text does not make it "impossible" for other offenses to have occurred. Appellant makes additional arguments based on decisions and rulings made by the state prosecutors and trial judge related to Appellant's civilian trial for the September 2014 allegations. However, those proceedings are irrelevant to the legal and factual sufficiency of the evidence produced in Appellant's court-martial.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions of Specifications 1 through 4 of the Additional Charge. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that we did not personally observe the witnesses, we also find the evidence factually sufficient.

### b. SK

#### i) Attempted sexual assault

In order to convict Appellant of attempted sexual assault in violation of Article 80, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) Appellant committed a certain overt act, specifically unbuttoning SK's pants;[13] (2) the act was done with the intent to commit a certain UCMJ offense, specifically sexual assault in violation of Article 120, UCMJ, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*); (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the intended offense. *See* 10 U.S.C. § 880(a); 2016 *MCM*, pt. IV, ¶ 4.b. The military judge instructed the court members on the elements of the attempted offense of sexual assault, which included: (1) Appellant committed a sexual act on SK by causing penetration of her vulva by his penis; (2) Appellant "did so by causing bodily harm to [SK], to wit: Penetrating her vulva with his penis;" and (3) Appellant did so without SK's consent. *See* 10 U.S.C. § 920(b)(1)(B); 2016 *MCM*, pt. IV, ¶ 45.b.(3)(b). "The term 'bodily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act . . . ." 10 U.S.C. § 920(g)(3).

SK's testimony provided sufficient evidence for the court members to find the elements proven beyond a reasonable doubt. She testified that in the fall of 2017 Appellant was arguing with her when he pinned her down on a bed and

---

[13] The specification did not allege a specific overt act, but the military judge and counsel agreed the court members would be instructed unbuttoning SK's pants was the overt act referred to in the specification.

told her he was going "to have [her] one last time." He then unbuttoned and attempted to remove her pants, which she physically resisted despite Appellant also strangling her. Moreover, the Government also introduced Facebook messages between SK and Appellant in which SK accused Appellant of threatening to "rape" her, in addition to physically abusing her; Appellant's response did not deny the accusation but states he "was seeking help," going to church, and "read[ing] the Bible a lot," which the court members could interpret as an acknowledgment that SK's claims had validity. The court members could reasonably conclude the Government proved beyond a reasonable doubt that Appellant unbuttoned SK's pants with the intent of penetrating her vulva with his penis without her consent, an act which amounted to more than mere preparation and tended to effect the commission of the attempted sexual assault.

### ii) Aggravated assault

In order to convict Appellant of aggravated assault in violation of Article 128, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) Appellant attempted to do, offered to do, or did bodily harm to SK; (2) Appellant did so with a certain force, to wit: strangling SK's neck with his hand; (3) the attempt, offer, or bodily harm was done with unlawful force or violence; and (4) the force was used in a manner likely to produce death or grievous bodily harm. *See* 10 U.S.C. § 928(b)(1); 2016 *MCM*, pt. IV, ¶ 54.b.(4)(a)(i)–(iv). "'Bodily harm' means any offensive touching of another, however slight." 2016 *MCM*, pt. IV, ¶ 54.c.(1)(a). "'Grievous bodily harm' means serious bodily injury." 2016 *MCM*, pt. IV, ¶ 54.c.(4)(a)(iii).

SK testified that in July 2017, Appellant strangled her during an argument outside SSgt AZ's apartment. SK testified Appellant squeezed her neck, similar to how he had done in the spring of 2017 when he strangled her until she blacked out, only this time it felt more "intense" and "violent" because Appellant was squeezing harder. SK "[f]elt like [she] couldn't breathe," and that she was "getting dizzy" and "lightheaded" and "losing consciousness." SK tried to scream and fight Appellant, who stopped after SK's friend RD came out of the apartment. The Government also called RD, who testified she heard Appellant yelling outside the apartment and heard SK say "stop, I can't breathe." When RD opened the door, she saw Appellant's "hands were both around [SK's] throat, and she was on her tippy toes, her face was flushed red, and she had tears streaming down her face." The Government also called TK, who the military judge recognized as an expert in forensic nursing. TK explained that strangulation pressuring the blood vessels in the neck restricts the flow of oxygen to the brain, leading to unconsciousness and eventually death. TK further testified it was "very common to not actually have physical signs of injury post

strangulation." The Government introduced sufficient evidence for the court members to rationally find beyond a reasonable doubt Appellant unlawfully did bodily harm to SK by strangling her neck with a force likely to cause grievous bodily harm or death.

### iii) Assault consummated by battery

In order to convict Appellant of assault consummated by a battery in violation of Article 128, UCMJ, the Government was required to prove: (1) Appellant did bodily harm to SK; and (2) the bodily harm was done with unlawful force or violence. 10 U.S.C. § 928(a); 2016 *MCM*, pt. IV, ¶ 54.b.(2).

Appellant was convicted of separate specifications of assault consummated by a battery against SK by unlawfully tackling her between on or about 14 February 2017 and on or about 30 May 2017, and by strangling her on divers occasions between on or about 14 February 2017 and on or about 18 October 2017. SK's testimony provided sufficient evidence for the court members to find each specification proven beyond a reasonable doubt. SK testified that during the first strangulation incident she described in the spring of 2017, Appellant tackled her to the floor as she tried to run to the bathroom after waking up from blacking out. SK also testified Appellant strangled her at three separate points in time during that incident, and again in October 2017 during the attempted sexual assault. These divers occasions of strangulation are separate and distinct from the strangulation incident outside SSgt AZ's apartment that formed the basis of the aggravated assault specification described *supra*. Although there were no other witnesses to these incidents, SK's testimony was sufficient evidence if the court members found her sufficiently credible, as they evidently did. *Rodriguez-Rivera*, 63 M.J. at 383.

### iv) Appellant's arguments regarding SK

Appellant cites the testimony of TG, a former Air Force member who lived with Appellant and SK in Mountain Home for approximately six months. TG testified he did not observe "any actual acts of violence" between Appellant and SK, only the "couple bickering" and "play fighting," and he did not observe "any bruising or signs of physical abuse" on SK. TG further testified that he was in security forces at the time, which made him a mandatory reporter for acts of domestic violence. However, the court members could rationally find TG's testimony did not substantially undermine SK's testimony with respect to the offenses of which Appellant was convicted. First, SK did not testify that any of the charged incidents occurred in TG's presence. Second, SK did not testify that any of Appellant's offenses against her resulted in observable physical marks or injuries, other than the alleged punch to her jaw of which the court members found Appellant not guilty. Third, by his own admission TG had been

a friend of Appellant's for a number of years and had written character statements for him in the past; thus the court members could reasonably conclude he was not an unbiased, neutral witness. Finally, the court members could reasonably have perceived it was not in TG's interest, as a mandatory reporter of domestic violence at the time, to admit he had observed any evidence of physical abuse.

We have also considered Appellant's remaining arguments, which we find unpersuasive and unnecessary to address in detail.

### c. Conclusion with Regard to Legal and Factual Sufficiency

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that we did not personally observe the witnesses, we also find the evidence factually sufficient.

## C. Destroyed Evidence

### 1. Additional Background

As stated *supra*, the State of Idaho prosecuted Appellant for the alleged rape and aggravated assault of CM in September 2014. The state did not charge Appellant with any of the other alleged offenses against CM for which he was later tried by court-martial. However, during the state court proceedings the prosecution attempted to introduce evidence Appellant "nonconsensually penetrated [CM's] anus with his penis" during the March 2014 incident pursuant to Idaho Rule of Evidence (I.R.E.) 404(b), which was similar to Mil. R. Evid. 404(b). The prosecution contended this evidence from March 2014 was relevant for a non-propensity purpose, specifically to show CM was afraid Appellant would do something similar and therefore did not physically resist Appellant in September 2014.

In a written ruling, the state trial judge precluded the prosecution from offering evidence about "sexual activity" in March 2014. The trial judge described the prosecution's "offer of proof" with respect to its I.R.E. 404(b) motion as consisting of: (1) "the State's assertion of statements [CM] said to the prosecution in preparation for trial;" (2) an audio recording made by civilian police in September 2014 "where [CM] states the last non[-]consensual act occurred six months before September 2014;" and (3) summaries of text messages exchanged between Appellant and CM in June 2014 and September 2014. As described in the trial judge's order, the text summaries from June 2014 include, *inter alia*, allegations by CM that Appellant had "forced [him]self" into her residence resulting in something "bad" happening, had "[v]iolently" raped

16

her twice at some point in the past, and had "made [CM] bleed from [her] butt." Appellant's responses included, *inter alia*, "It's been way more than a month. And I'd appreciate it if you stopped reminding me [o]f that. Trust me, I'll never forget what I did to you." As described by the trial judge, the September 2014 text exchanges included, *inter alia*, CM's suggestion that Appellant tell his new girlfriend that he is "a rapist who uses canola oil to anally rape [CM] after breaking in[to] [CM's] house." The trial judge characterized these allegations as being "intermingled with 'begging' to have sex or cuddle or at least say good-bye before leaving town, allegations of infidelity, threats of withholding custody of the children, and regrets about a relationship passed." The trial judge also cited a stipulation between the parties to the effect that CM had told the prosecution CM and Appellant continued to have consensual sex until January 2014, which the trial judge found to be contrary to earlier statements CM made to the police. In addition, the parties stipulated that CM had sent graphic sexual photos and a video to Appellant in January 2014, and another three graphic photos in April 2014. The trial judge also noted the prosecution had not offered sworn testimony from CM regarding the March 2014 incident in support of its motion.

The trial judge explained her ruling:

> Considering the audio recording, the description of photos and the video in the stipulation, the totality of the texts, and the unsworn statement relayed by [CM] during two interviews which were not under oath, the court determines [CM's] statement to the police was not credible. Additionally, given the totality of the circumstances, the court does not find her unsworn statements to the prosecution any more credible.

The trial judge did not find sufficient evidence existed from either CM's statements or from the text messages "to support a conclusion by a reasonable jury that the March 5, 2014 non[-]consensual act is fact as described by [CM] . . . ."

During state court trial proceedings in June 2015, a civilian police detective testified that he extracted "thousands" of messages from CM's phone. At another point in the proceedings, the prosecutor referred to approximately 16,000 text messages, instant messages, and emails having been downloaded from CM's phone.

Appellant's state trial in June 2015 resulted in a finding of not guilty on both charges. According to a message from the Mountain Home Police Department evidence custodian sent to Air Force trial counsel in July 2020 (five years later), the "normal practice" in such a situation would have been to contact the owners of the various items held as evidence; items not claimed within 30 days

would be "disposed." Following the acquittal, the civilian police did not retain either Appellant's phone, which they had seized, or the data extracted from CM's phone. The civilian attorney who represented Appellant at his 2015 state trial did not retain a copy of the evidence beyond 2018.

Charges I and II and their specifications—alleging offenses against SK—were preferred against Appellant on 30 October 2019. The Additional Charge and its specifications—alleging offenses against CM—were preferred on 28 February 2020.

On 28 May 2020, the Defense submitted to the Government a discovery request seeking, *inter alia*, various items of physical and electronic evidence previously held by the Mountain Home Police Department in connection with the state prosecution of the September 2014 incident. In June and July 2020, the Government responded to the effect that much of this evidence, to include Appellant's and CM's cell phones and any data extracted from them, had been "disposed of" or destroyed.

On 15 July 2020, the Defense filed a motion to either dismiss the four specifications of the Additional Charge involving CM or indefinitely abate the court-martial proceedings with respect to those specifications. The Defense contended:

> Several critical pieces of physical evidence, including [Appellant's] and [CM's] cell phones, which are of such central importance to an issue that is essential to a fair trial, have been lost and destroyed. There is no adequate substitute because this is evidence from almost six years ago and [of] the few witnesses the Defense has been able to speak to, the vast majority do not remember anything about these alleged acts. It is also reasonable to believe exculpatory evidence would be found and a witness summary would not be adequate. The Defense is not at fault for the destruction of the evidence and abatement is the only remedy available.

The Government opposed the motion.

After conducting a hearing at which she received evidence and heard argument from counsel, the military judge issued a written ruling denying the Defense's motion. The military judge found, as a "preliminary matter," the Defense had failed to articulate the "necessity" of much of the evidence it sought in discovery, and therefore failed to meet the threshold for production under R.C.M. 703(e)(1). However, the military judge found that certain items the Defense sought did meet the threshold for production, and to these she applied

the criteria set forth in *United States v. Simmermacher*, 74 M.J. 196 (C.A.A.F. 2015), to determine whether their unavailability required abatement of proceedings or other relief.

Relevant to the instant appeal, the military judge found the Defense failed to demonstrate communications contained on Appellant's and CM's respective phones were "of such central importance as to be essential to a fair trial." The military judge noted the civilian police report, which was in the possession of the parties, had some of the text communications attached. The military judge found the preponderance of the evidence did not indicate the existence of "additional text messages directly pertaining to the charged or uncharged offenses." The military judge further noted the messages attached to the report and in the possession of the parties "include[d] discussions of infidelity, distrust, and child custody," and the preponderance of the evidence did not demonstrate the phones contained additional "noncumulative evidence of bias or motive." The military judge further observed that the text summaries referenced in the state trial judge's I.R.E. 404(b) ruling described the content of the texts in the possession of the parties, and a "preponderance of the evidence does not establish that additional texts were presented to the District Court beyond those contained in the [police] report, or that [additional texts] would be non-cumulative with the [police] report." Similarly, the military judge noted the Defense was evidently in possession of the photos and videos referenced in the state trial judge's ruling, and the suggestion that additional non-cumulative images or videos existed at some point was "entirely speculative." The military judge concluded the missing police audio recording of CM and additional communications, images, or videos contained on the phones were not "of central importance to [CM's] credibility or [ ] any other aspect of the charged specifications," and their absence "will not deprive [Appellant] of a fair trial."

The military judge's ruling went on to address the remaining elements of the *Simmermacher* analysis. The military judge found the preponderance of the evidence did not demonstrate there were not adequate substitutes for the missing evidence. With regard to the audio recording of CM, the Defense possessed the state trial judge's ruling that described what CM had said. With regard to the data from the phones, the military judge found the Defense had not demonstrated how the information in and attached to the police report, "combined with available witness testimony, are inadequate to demonstrate any aspect of the relationship between [Appellant] and [CM] at the time of the alleged assaults." Finally, the military judge found the Defense could not have prevented the loss of the audio recording or data from CM's phone; however, a preponderance of the evidence indicated Appellant could have prevented the

loss of his phone because, more likely than not, the Mountain Home police provided him the opportunity to claim his phone before they disposed of it.

The military judge subsequently denied two defense motions for reconsideration of her ruling on the motion to abate proceedings.

**2. Law**

"A military judge's failure to abate proceedings is reviewed for an abuse of discretion." *Simmermacher*, 74 M.J. at 199 (citing *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001)). "[A]n abuse of discretion occurs 'when [the military judge's] findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law.'" *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015) (second alteration in original) (quoting *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)).

"Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(e)(1); *see also* Article 46(a), UCMJ, 10 U.S.C. § 846(a) ("[T]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe."). R.C.M. 703(e)(2) provides,

> [A] party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party.

In *Simmermacher*, the CAAF explained the three criteria as to whether a party was entitled to relief due to lost or destroyed evidence that was otherwise subject to production under R.C.M. 703: (1) whether the "evidence was of such central importance that it was essential to a fair trial;" (2) whether there was an "adequate substitute" for the evidence; and (3) whether the loss or destruction was the fault of or could have been prevented by the requesting party. 74 M.J. at 201–02. Unlike a claim rooted in constitutional due process, relief under R.C.M. 703 does not require a demonstration of bad faith by the Government. *Id.* at 199–201.

The party seeking relief under R.C.M. 703 bears the burden to demonstrate the criteria have been met. *See United States v. Warda*, ___ M.J. ___, No. 22-0282, 2023 CAAF LEXIS 687, at \*21 (C.A.A.F. 29 Sep. 2023) (citing *Simmermacher*, 74 M.J. at 199). "Unless otherwise provided . . . , the burden of proof on any factual issue the resolution of which is necessary to decide a motion shall be by a preponderance of the evidence." R.C.M. 905(c)(1).

If a party demonstrates the *Simmermacher* criteria are met, and "[i]f a continuance or other relief cannot produce the missing evidence, the remaining remedy for a violation of R.C.M. 703(f)(2) is abatement of the proceedings." *Simmermacher*, 74 M.J. at 201 (footnote omitted).

### 3. Analysis

Appellant contends the military judge clearly abused her discretion by failing to abate the proceedings due to the lost and destroyed evidence formerly in the possession of the Mountain Home police, specifically focusing on the digital communications between Appellant and CM. We disagree.

With regard to the first *Simmermacher* criterion—whether the unavailable evidence was of such central importance as to be essential to a fair trial—Appellant makes two primary arguments. We address each in turn.

First, Appellant cites the outcome of the state trial proceedings in 2015. He asserts, "the civilian judge in that case specifically relied upon the destroyed evidence in ruling favorably for [Appellant] on [I.R.E.] 404(b) and [I.R.E.] 412[14] issues relating to [CM's] claim that [Appellant] raped her on 5 March 2014." We are not persuaded the state court judge relied upon destroyed evidence. The military judge found a preponderance of evidence indicated the state trial judge did not consider the substance of text messages between Appellant and CM beyond those attached to the police report, which were available to the Government and Defense at Appellant's court-martial. We find this conclusion is supported by the state trial judge's written ruling and was not clearly erroneous, and the military judge did not abuse her discretion in this respect. Appellant also suggests the fact that Appellant was acquitted in state court of the alleged offenses from September 2014 indicates the lost evidence "*indisputably* contained exculpatory information." However, this is speculation. The fact of Appellant's acquittal in June 2015 does not necessarily imply

---

[14] The state trial judge's ruling addressing the prosecution's I.R.E. 404(b) motion also addressed a defense motion to introduce evidence of CM's past sexual behavior pursuant to I.R.E. 412. We find the I.R.E. 412 aspect of the ruling is not pertinent to the issue before us on appeal.

the existence of unknown exculpatory evidence on Appellant's and CM's phones. Appellant does not cite evidence of the content of any assertedly exculpatory communication from the now-unavailable evidence, much less one that played any material role in his 2015 state trial.

Second, Appellant refers to a number of occasions at his court-martial when CM's testimony mentioned electronic communications between herself and Appellant, or mentioned other media that may have been captured on the now-unavailable phones. In particular, Appellant cites CM's testimony about flirtatious or affectionate messages Appellant sent her after the January 2014 incident, about texting a friend when Appellant unexpectedly entered her house in March 2014, and about Appellant apparently taking photos of her with his phone during the March 2014 incident. Appellant argues these "matters [ ] could have clearly been rebutted by the destroyed evidence, and the [D]efense was not able to rebut [them] with the very limited text messages and digital evidence that still existed at the time of the court-martial." However, again Appellant speculates about lost evidence without identifying any specific communication, image, or other item of digital evidence that had actually existed *and* would have been exculpatory, materially contradicted CM's testimony, or was otherwise essential. We are not persuaded the Defense met its burden to demonstrate the unavailable evidence was essential to a fair trial.

The instant case is dissimilar from cases in which appellate courts found the unavailable evidence was essential. For example, in *Simmermacher*, the Government negligently destroyed the urine sample that constituted "the sole evidence" of the charged drug use before the sample could be retested in accordance with a defense request. 74 M.J. at 201. *United States v. Seton* involved a lost surveillance video which, according to a witness's memory of its contents, "would have directly impeached the credibility" of the alleged victim of a sexual assault where there were no other witnesses. Misc. Dkt. No. 2013-27, 2014 CCA LEXIS 103, at *14 (A.F. Ct. Crim. App. 24 Feb. 2014) (order). Neither situation is comparable to Appellant's case.

*Warda*, recently decided by the CAAF, does have certain similarities to Appellant's case; however, it is also distinguishable. *Warda* involved unavailable immigration records of the alleged spousal rape victim (the accused's former spouse), where the victim's credibility was an essential issue and the victim's immigration status was "the central [tenet] of the defense theme in th[e] case." 2023 CAAF LEXIS 687, at *24 (first alteration in original) (quoting defense brief). The defense articulated the alleged victim's immigration records would provide evidence to impeach her credibility regardless of what they contained. *Id*. at *24–25. The CAAF explained:

> If she claimed abuse, the evidence would support her motive to fabricate because claiming she was a victim of a sexual assault would provide a way to continue her legal residency in the United States without assistance from [the a]ppellant after her divorce. If she did not claim abuse, the evidence would undermine the credibility of her sexual assault allegations in this case, and the defense could cross-examine her on the prior inconsistent statement. Furthermore, if she sought resident status on some other ground, the evidence would undermine the credibility of her assertion that the sole reason she immigrated to the United States was to be with her husband.

*Id*. at \*23–24. Under these circumstances, the CAAF found "the defense established that evidence concerning [the alleged victim's] immigration status was of central importance to her credibility, the central issue in this case." *Id*. at \*26. Although CM's credibility was similarly of central importance in Appellant's case, the critical distinction is that Warda demonstrated how the unavailable evidence would undermine the alleged victim's credibility, whereas Appellant does not.

Under the circumstances of this case, Appellant has failed to demonstrate the military judge's conclusion that the lost or destroyed evidence was not essential to a fair trial fell "outside the range of choices reasonably arising from the applicable facts and the law." *Stellato*, 74 M.J. at 480 (citation omitted). Accordingly, Appellant cannot prevail on appeal, and we need not address the remaining *Simmermacher* criteria.

**D. Military Judge's Refusal to Declare Mistrial**

**1. Additional Background**

*a. CM's Testimony*

In a pretrial ruling, the military judge held that evidence of Appellant's alleged sexual assault against CM in September 2014—which was the subject of Appellant's civilian court acquittal in June 2015—would not be admissible in his court-martial pursuant to Mil. R. Evid. 413 because the probative value was substantially outweighed by the dangers of confusion of the issues or unfair prejudice.

During cross-examination, trial defense counsel questioned CM about her divorce from Appellant. The following colloquy occurred:

> Q. [Trial Defense Counsel] And there was no legal dispute over the money?

A. [CM] Correct.

Q. Who owned the house?

A. We both did.

Q. And who sold it?

A. The bank.

Q. Who took the money?

A. Nobody.

Q. You didn't take any profits from it?

A. No, I had to file bankruptcy because the mortgage stopped getting paid when he got arrested.

Trial defense counsel then moved on to questions about CM's living arrangements after the house was sold.

A few minutes later, during an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session to address a government objection to an unrelated question, trial defense counsel brought up CM's reference to Appellant being "arrested" as quoted above. The military judge agreed CM's comment was "improper" and offered to provide the court members a corrective instruction. With the military judge's permission, trial defense counsel deferred the decision whether to request such an instruction. However, at the Defense's request, the military judge did instruct CM not to testify about "the 21 September 2014 incident" or Appellant's civilian arrest.

At a later point after CM's cross-examination resumed, trial defense counsel questioned CM about certain text messages between herself and Appellant which she had provided to the Government and which had been made into prosecution exhibits. Trial defense counsel suggested CM provided the Government "the worst texts that [CM] could find." CM responded that she provided "texts that related to the charges," and that her "device was completely dumped with metadata so [she] assumed that through the county that all was accessible." CM's reference to "the county" evidently referred to civilian law enforcement in Elmore County, Idaho, where the September 2014 allegation was prosecuted. Trial defense counsel continued this line of questioning, suggesting the text conversations CM provided the Government had been altered. In response, CM testified:

In 2014, when Elmore County asked me to send text messages, I thought I was being helpful by removing anything that wasn't useful. But then she said, no, we need all of them, so then I sent

the full text messages. And I did not alter them by deleting the actual text, I altered them by placing screen shots, like, only giving snippets of screen shots. And then when she asked for the full conversations, I did that but all the metadata was extracted includ[ing] deleted messages, deleted emails, and everything by the FBI lab in Boise.

During a subsequent Article 39(a), UCMJ, session, trial defense counsel characterized CM as having disobeyed instructions from trial counsel and the military judge by making unnecessary references to Appellant's prior civilian prosecution for the September 2014 allegation. At the Defense's request, the military judge granted trial defense counsel additional time to research an appropriate remedy for these purported errors.

Trial defense counsel subsequently made an oral motion for a mistrial pursuant to R.C.M. 915(a). The Defense argued that despite instructions to the contrary, CM referred to Appellant's arrest, to turning over evidence to Elmore County, and to the FBI lab, "essentially" telling the court members "that there's a lot more here happening." Trial defense counsel argued the court members had "heard way too much information," and "this [wa]s no longer a fair proceeding" because there was "no way" to "unring this bell." Trial counsel responded there was no "plain and obvious reason for declaring a mistrial" because CM's statements "refer[red] only to the fact that there was an investigation without the reasons for that investigation."

After a recess, the military judge entered an oral ruling denying the defense mistrial motion. The military judge cited *United States v. Flores*, 80 M.J. 501 (C.A.A.F. 2020), for the proposition that mistrial is an unusual and disfavored remedy of last resort, not to be employed if curative instructions are adequate. The military judge found CM's reference to an arrest, "not tied to any particular offense or time frame," could be adequately addressed by an instruction. Similarly, the military judge explained:

> [A]s to the testimony relating to the text messages, the Court notes that [CM] used the term[,] she[ ] referenced the county, she had referenced the FBI. While it was likely that it was clear to all the participants of the trial what she was referring to, the Court is not [at] all sure that the members even -- even understood that testimony. And if they did, the reasons for such collection and the time frame, anything surrounding the collection or reviewed by any civilian agencies, was not addressed in her testimony. So at this time the only possible improper inference that the members could draw would be that at some point prior

to the current investigation, somebody associated with civilian investigative agencies conducted a review of these text messages. And the Court simply does not find that to be such a -- such inflammatory information or somehow prejudicial information that cannot be cured through the normal measure of a -- of a curative instruction.

The military judge read to the counsel a draft curative instruction she had prepared. Trial defense counsel did not propose any changes or additions to the instruction. The military judge subsequently provided the following instruction to the court members:

You have heard testimony from [CM] regarding her earlier collection of text messages. Any testimony regarding [CM's] collection or communication of text messages to any entity other than the Air Force prosecutors in this case is inadmissible and you must completely disregard it. I have ruled that any review by a separate entity of these text messages is not a proper matter for your consideration. You may consider testimony that [CM] herself constructed these documents in the first instance and testimony regarding opportunity she had to alter them. You may not speculate regarding whether any entity other than the Air Force prosecutors have reviewed them and you must completely disregard this testimony.

Every court member indicated they would be able to follow this instruction.

### b. Senior Master Sergeant (SMSgt) MB's Testimony

Later in the trial, the Government called SMSgt MB, Appellant's former first sergeant, as a rebuttal witness. Trial counsel asked SMSgt MB about his contact with Appellant's family and friends—including SK—after Appellant was arrested in August 2018 following the incident with HG. The following colloquy occurred during the redirect examination:

Q. [Trial Counsel] At the time that you called [SK], did you know [what] the allegations against [Appellant] were?

A. [SMSgt MB]  In relation to?

Q. Why he was in confinement?

A. Why he was arrested?

Q. Yes.

A. Yes, sir.

Q. What did you understand the nature of the allegations to be?

A. That there was, he pointed a loaded weapon.

Q. Let me ask you just a quick question, did you understand that he was in confinement because of an allegation of sexual assault?

A. Apologies, it's been a couple of years. I knew he was arrested and usually when that happens, they do talk over charges. I cannot specifically recall that at that point in time.

Q. Understood. Did you understand that there was a victim in that case?

A. Yes, sir.

Q. And the name of that victim was [HG], is that right?

A. Yes, sir.

Q. Or -- you do recall that?

A. Yes.

Q. But you are having some difficulty in remembering exactly what the allegation was?

A. Yes, sir.

Trial defense counsel did not object to this testimony, but at the conclusion of the direct examination requested an Article 39(a), UCMJ, session at which the Defense again moved for a mistrial. Trial defense counsel argued the military judge had previously excluded "any kind of allegation of [a] firearm or pointing a firearm,"[15] and explained "the concern is that [the court members] can't un-hear it and a curative instruction just will not be sufficient to un-hear that." In response, trial counsel argued a curative instruction would be an adequate and appropriate remedy.

In an oral ruling, the military judge denied the mistrial motion, noting that instructions were the preferred method of curing error. The military judge opined this "passing reference[ ]" was the "the sort of evidence" court members were "routinely . . . instructed to disregard during courts-martial." The

---

[15] This was evidently a reference to a prior ruling the military judge had made with respect to SK's testimony. The military judge had permitted SK to testify that Appellant had threatened to kill himself, but prohibited mentioning that Appellant had handled or pointed a firearm in relation to this threat.

military judge read a proposed curative instruction to the counsel, and neither party objected or proposed additions. After warning SMSgt MB to avoid any further references to a firearm or certain other inadmissible matters, the military judge read the following instruction to the court members:

> To the extent that you believe that any witness testified or inferred that [Appellant] in any way possessed or mishandled a firearm, that testimony is completely irrelevant to the charges and specifications in this case. Any such testimony is not admissible and must be completely disregarded by you. You may not consider such testimony for any purpose.

The military judge individually asked each court member whether they would be able follow this instruction. Each court member stated they would.

### 2. Law

"A military judge has discretion to 'declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings.'" *United States v. Coleman*, 72 M.J. 184, 186 (C.A.A.F. 2013) (quoting R.C.M. 915(a)). Mistrial is "'a drastic remedy' which should be used only when necessary 'to prevent a miscarriage of justice.'" *United States v. Harris*, 51 M.J. 191, 196 (C.A.A.F. 1999) (quoting *United States v. Garces*, 32 M.J. 345, 349 (C.M.A. 1991)). "Because of the extraordinary nature of a mistrial, military judges should explore the option of taking other remedial action, such as giving curative instructions." *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009) (citations omitted). "A military judge has a superior vantage point over appellate courts in making this determination and thus gets 'considerable latitude in determining when to grant a mistrial.' We will not reverse a military judge's determination unless there is 'clear evidence of abuse of discretion.'" *Flores*, 80 M.J. at 507 (quoting *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003)).

### 3. Analysis

#### a. CM's Testimony

Appellant contends CM's testimony "fits squarely within the standards required for a mistrial," essentially repeating arguments trial defense counsel made to the military judge. We disagree.

Although the military judge indicated CM's references to events connected to Appellant's civilian trial were improper, they were not so damaging as to cast substantial doubt on the fairness of the proceedings. CM's brief references

to an arrest, Elmore County, and the FBI lab may have suggested civilian agencies had some role in investigating Appellant, but by themselves they do not demonstrate the existence of uncharged misconduct, much less a separate civilian criminal proceeding. We find the military judge did not abuse her discretion by determining the corrective instruction, which the court members affirmatively acknowledged they could follow, adequately averted substantial doubt as to the fairness of the proceedings. *Cf. United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) ("Absent evidence to the contrary, this Court may presume that members follow a military judge's instructions." (Citations omitted).). Accordingly, we find Appellant is not entitled to relief.

### b. SMSgt MB's Testimony[16]

Similarly, we find the military judge did not clearly abuse her discretion by denying the defense motion to declare a mistrial following SMSgt MB's testimony. SMSgt MB made a brief reference to his understanding that Appellant had pointed a firearm. Trial counsel immediately responded by reorienting SMSgt MB away from such a claim. SMSgt MB conceded his memory of the allegations from the HG incident was poor. The military judge could reasonably conclude the court members were unlikely to be improperly influenced by such testimony and that a curative instruction would be an adequate remedy. The military judge not only provided a clear curative instruction—without further objection from the Defense—but asked each court member to individually state whether they would be able to follow it. We find the military judge appropriately concluded a curative instruction was the appropriate remedy.

## E. Mil. R. Evid. 413

### 1. Additional Background

Before trial, the Government provided notice to the Defense that pursuant to Mil. R. Evid. 413 it intended to introduce evidence that Appellant sexually assaulted HG in August 2018, an alleged offense of which Appellant was acquitted in a civilian criminal trial in April 2019. The Defense moved in limine to exclude this evidence from Appellant's court-martial. The Defense argued that allowing evidence of an alleged sexual assault charged in a separate proceeding which resulted in acquittal would "create a dangerous loophole" in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403. The Government opposed the motion.

---

[16] Appellant personally asserts, pursuant to *Grostefon*, 12 M.J. 431, the military judge abused her discretion with regard to SMSgt MB's testimony.

In a written ruling, the military judge held the alleged sexual assault against HG, "[a]ppropriately tailored and with appropriate instruction," was admissible under Mil. R. Evid. 413 and Mil. R. Evid. 403. The military judge found *Hills* did not bar the admission of evidence of a sexual assault not charged in the current proceeding, notwithstanding the uncharged alleged offense was the subject of a prior acquittal. The military judge then analyzed the admissibility of the evidence under Mil. R. Evid. 413 in light of the steps and factors set forth in *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000).

HG testified as a prosecution witness at Appellant's court-martial, describing an alleged sexual assault by Appellant as summarized in paragraph I.C of Background, *supra*.

**2. Law**

We review a military judge's decision to admit evidence pursuant to Mil. R. Evid. 413 for an abuse of discretion. *Hills*, 75 M.J. at 354 (citation omitted). "An abuse of discretion occurs when a military judge's decision is based on clearly erroneous findings of fact or incorrect conclusions of law." *United States v. Hernandez*, 81 M.J. 432, 437 (C.A.A.F. 2021) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000).

Mil. R. Evid. 413 provides that "[i]n a court-martial proceeding for a sexual offense, the military judge may admit evidence that the accused committed any other sexual offense. The evidence may be considered on any matter to which it is relevant." Mil. R. Evid. 413(a). "This includes using evidence of either a prior sexual assault conviction or uncharged sexual assaults to prove that an accused has a propensity to commit sexual assault." *Hills*, 75 M.J. at 354 (citing *United States v. James*, 63 M.J. 217, 220–22 (C.A.A.F. 2006)). However, the prosecution cannot "use charged sexual misconduct to prove propensity to commit other charged sexual misconduct under [Mil. R. Evid.] 413." *United States v. Upshaw*, 81 M.J. 71, 74 (C.A.A.F. 2021) (citing *Hills*, 75 M.J. at 352), *recon. granted by* 81 M.J. 313 (C.A.A.F. 2021). For purposes of Mil. R. Evid. 413, a "sexual offense" includes, *inter alia*, "any conduct prohibited by Article 120[, UCMJ]." Mil. R. Evid. 413(d)(1).

In *Wright*, the CAAF explained that military judges are required to make three threshold findings before admitting evidence under Mil. R. Evid. 413: (1) the accused is charged with an offense of sexual assault; (2) the evidence proffered is evidence of his commission of another offense of sexual assault; and (3) the evidence is relevant under Mil. R. Evid. 401 and Mil. R. Evid. 402. 53 M.J. at 482. With respect to finding (2), the military judge "must conclude that the members could find by a preponderance of the evidence that the offenses

occurred." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citing *Wright*, 53 M.J. at 483). Additionally, the military judge must apply the balancing test of Mil. R. Evid. 403 to determine whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other countervailing considerations. *Wright*, 53 M.J. at 482. In *Wright*, the CAAF set forth a non-exclusive list of factors to be considered under Mil. R. Evid. 403 in the context of Mil. R. Evid. 413 evidence: the strength of the proof of the prior act of sexual assault; the probative weight of the evidence; the potential for less prejudicial evidence; distraction of the factfinder; the time needed for proof of the prior conduct; the temporal proximity of the prior conduct to the charged offense(s); the frequency of the acts; the presence or absence of intervening circumstances between the prior acts and charged offenses; and the relationship between the parties involved. *Id.* (citations omitted). "[I]nherent in [Mil. R. Evid.] 413 is a general presumption in favor of admission." *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) (citing *Wright*, 53 M.J. at 482–83).

### 3. Analysis

Appellant contends the military judge abused her discretion by admitting HG's testimony because she "disregarded the significance of the prior acquittal, the lack of similarity of HG['s] allegation[ ] . . . to the charged offenses in the case . . . , and the highly prejudicial quality of HG's allegations, which included claims that [Appellant] penetrated her vagina with his penis without consent." We find no abuse of discretion.

The military judge issued a detailed ruling that applied the correct legal framework to the evidence. As for the three threshold *Wright* findings, Appellant was charged with offenses of sexual assault; the proffered evidence was evidence of another sexual assault; and the military judge permissibly found the proffered evidence was "relevant for a propensity purpose." The military judge correctly determined that *Hills* did not bar evidence of an uncharged sexual assault that was the subject of a prior acquittal; however, she did not disregard the significance of the acquittal. She "carefully considered" the prior acquittal but found the court members could nevertheless find by a preponderance of the evidence that the offense occurred. The military judge distinguished *Solomon*, cited by the Defense at trial and on appeal. In that case, as in the instant case, the appellant had been previously acquitted of alleged sexual assaults subsequently admitted as Mil. R. Evid. 413 evidence. 72 M.J. at 180–81. However, in *Solomon*, unlike the instant case, there existed unreconciled alibi evidence that conflicted with the allegations. *Id.* at 181. As the CAAF explained,

> The problem is not that an incident for which an accused has been previously acquitted may never be admitted under [Mil. R. Evid.] 413; rather, the problem is that the military judge altogether failed to mention or reconcile [the a]ppellant's important alibi evidence and gave little or no weight to the fact of the prior acquittal.

*Id.* at 180.[17] In contrast to *Solomon*, in the instant case the military judge was not presented with evidence tending to provide Appellant with an alibi or other defense for the alleged sexual assault of HG. Accordingly, we do not find the military judge abused her discretion in finding the court members could find the sexual assault occurred by a preponderance of the evidence based on the sworn testimony of HG. The military judge's conclusion does not imply she failed to consider the prior acquittal, and she explicitly did consider it.

The military judge also conducted a detailed Mil. R. Evid. 403 analysis specifically addressing each of the *Wright* factors. She found a majority of the factors favored admission. Notably, with regard to distraction of the factfinder, the military judge explained the Government would be limited to the testimony of HG herself, and would not be permitted to elicit certain circumstantial evidence of Appellant's guilt, "the probative value of which [wa]s substantially outweighed by the danger of creating a mini trial regarding this offense." Additionally, with regard to the probative value of the evidence, contrary to Appellant's assertion on appeal, the military judge acknowledged "arguabl[e] dissimilarities" between HG's allegation and the charged offenses, including the absence of a pre-existing intimate relationship and the commission of the alleged offense while HG was asleep rather than through the actual or threatened use of force. The military judge also again acknowledged the prior acquittal. However, the military judge reasonably concluded these differences did not "appreciably undermine the probative weight" of the alleged offense, and we do not find this conclusion was clearly erroneous or unreasonable in light of the general presumption in favor of admitting Mil. R. Evid. 413 evidence.

---

[17] *Cf. United States v. Hutchins*, 78 M.J. 437, 445 (C.A.A.F. 2019) ("'[A]n acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof' such as in [a Mil. R. Evid.] 404(b) context.") (first alteration in original) (quoting *Dowling v. United States*, 493 U.S. 342, 349 (1990))).

**F. Sentence Severity**

**1. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citation omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Although the Courts of Criminal Appeals (CCAs) are empowered to "'do justice[ ]' with reference to some legal standard," we are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203 (C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

CCAs are "not required . . . to engage in sentence comparison with specific [other] cases 'except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). Cases are "closely related" when, for example, they involve "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id*. CCAs have "broad latitude" to determine whether cases are closely related. *United States v. Behunin*, 83 M.J. 158, 162 (C.A.A.F. 2023). Although not required to do so, a CCA may compare an appellant's case to other non-"closely related" cases in order to assess the propriety of the sentence. *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001). However, unless the cases are closely related, "[t]he appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *Ballard*, 20 M.J. at 283).

**2. Analysis**

Appellant contends the adjudged 18 years and 6 months in confinement is inappropriately severe in light of the seriousness of the offenses, Appellant's service record, "all other matters contained in the record of trial," and "the sentences in several closely related cases." Appellant contends this court should reduce his term of confinement by "at least" 12 years. We disagree.

Appellant cites the offenses and sentences recorded in 11 opinions from this court issued between 2002 and 2017.[18] Appellant describes these cases as "closely related" to his, evidently on the theory that they involved offenses somewhat similar to his own. However, cases are not "closely related" to Appellant's merely because they also involve Article 120 or Article 128, UCMJ, offenses, or physical or sexual abuse against intimate partners. Appellant fails to identify any "direct nexus" between any of those appellants and himself. *See Lacy*, 50 M.J. at 288. We do not find these cases to be closely related. Moreover, Appellant has not demonstrated that an exception to the general rule against directly comparing sentences in non-closely related cases should apply in this case. *See LeBlanc*, 74 M.J. at 659. Accordingly, we decline to compare specific sentences here.

Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service including multiple deployments, and all other matters contained in the record of trial, we conclude Appellant's sentence is not inappropriately severe.

## G. Post-Trial Confinement Conditions

### 1. Additional Background

Near the conclusion of Appellant's court-martial, the military judge confirmed with Appellant that trial defense counsel had advised him in writing of his post-trial and appellate rights. This document, with signed acknowledgments by Appellant and trial defense counsel, was included in the record of trial as an appellate exhibit. Among other advice, Appellant was specifically advised that to obtain relief for deficient conditions of confinement he "ordinarily must exhaust every administrative means available to attempt to correct the issue," including submitting complaints through the confinement facility's process, "requesting relief through clemency (if known at the time)," and filing a complaint pursuant to Article 138, UCMJ, 10 U.S.C. § 938.

---

[18] The Government has not objected to our consideration of the cases Appellant cites on the grounds that they are outside the record of trial. *See United States v. Jessie*, 79 M.J. 437, 441–46 (C.A.A.F. 2020). In light of our conclusion that sentence comparison is not appropriate in this case, we decline to further address the application of *Jessie* to this issue. *Cf. United States v. Behunin*, 83 M.J. 158, 161 (C.A.A.F. 2023) (assuming without deciding the CCA properly considered the entry of judgment from a separate court-martial); *United States v. Stanton*, 80 M.J. 415, 417 n.2 (C.A.A.F. 2021) (considering documents not included in or attached to the record of trial "because neither party has objected to [the court's] consideration of them").

After Appellant was sentenced on 13 March 2021, he entered confinement in the Elmore County Jail (ECJ), a civilian confinement facility in Mountain Home, Idaho. Appellant remained at ECJ until he was transferred to the United States Disciplinary Barracks (USDB) at Fort Leavenworth, Kansas, on 1 September 2021. Appellant's request for relief from the convening authority pursuant to R.C.M. 1106, dated 20 March 2021, did not address alleged deficiencies in his confinement conditions.

On appeal, Appellant moved to attach to the record a declaration from himself dated 27 April 2023 in which he alleges deficiencies in the conditions of his confinement. Among other complaints, Appellant alleges at the ECJ he was housed "in segregation" except for a period of less than two weeks in April 2021 and one day in August 2021, when he shared a cell with another servicemember. Appellant further states he was allowed outside his cell only one hour per day. Appellant asserts during his time at the ECJ he was allowed only one visit with his fiancée and son. Appellant's declaration does not address ECJ's grievance process, but claims he "had no way of filing grievances to the Air Force while [he] was in there." Appellant also asserts he was "in pain the entire time" he was in confinement, and that on 29 March 2022 he received an ultrasound which indicated he had an inguinal hernia but the USDB "hasn't done anything about" his request for surgery. This court granted Appellant's motion to attach.

In response, the Government moved to attach a declaration from the ECJ Deputy Commander. That declaration described the ECJ process for confinees to file grievances and request medical attention or visitation. Attached to the declaration were the 22 pages of grievances and requests Appellant made during his confinement at ECJ, according to the Deputy Commander. This attachment indicates that, among other requests, in April 2021 Appellant made multiple requests to have his own cell and not to be housed with another confinee. The attachment does not indicate any requests for medical attention. This court granted the Government's motion to attach.

### 2. Law

We review de novo whether an appellant has been subjected to impermissible conditions of confinement in violation of the Eighth Amendment or Article 55, UCMJ. *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)).

"Both the Eighth Amendment and Article 55, UCMJ, prohibit cruel and unusual punishment. In general, we apply the Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, UCMJ, except where legislative intent to provide greater protections under Article 55, UCMJ,

is apparent." *United States v. Gay*, 74 M.J. 736, 740 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016) (citation omitted). "[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)). To demonstrate a violation of the Eighth Amendment, an appellant must show:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety; and (3) that he "has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ, 10 USC § 938 [(2000)]."

*Id.* (omission and second alteration in original) (footnotes omitted); *see also United States v. Pullings*, 83 M.J. 205, 206 (C.A.A.F. 2023) (applying the *Lovett* test to claims of cruel and unusual confinement conditions).

### 3. Analysis

As an initial matter, we note we may consider the declarations of Appellant and the ECJ Deputy Commander to evaluate Appellant's claims of cruel and unusual punishment in violation of the Eighth Amendment and Article 55, UCMJ, despite these declarations being outside the "entire record." *See United States v. Jessie*, 79 M.J. 437, 440–44 (C.A.A.F. 2020).[19] In addition, we have considered whether a post-trial evidentiary hearing is required to resolve any contradictions between the declarations. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam). We find such a hearing is not required.

Appellant has failed to meet his burden with respect to all three prongs of the *Lovett* test for an Eighth Amendment violation. Appellant has not demonstrated he was denied "necessities." Appellant contends his extended stay in "segregation" and limitation to one hour outside his cell per day did not comport with Department of Defense regulations and procedures applicable to

---

[19] Because Appellant's allegedly unlawful confinement conditions were not raised by the "entire record" as defined in *Jessie*, we may not consider these declarations in determining whether Appellant's confinement conditions warrant sentence appropriateness relief in the absence of an Eighth Amendment or Article 55, UCMJ, violation. *See United States v. Willman*, 81 M.J. 355, 358 (C.A.A.F. 2021), *cert. denied*, 142 S. Ct. 2811 (2022).

military confinement facilities such as the USDB. However, neither the Eighth Amendment nor Article 55, UCMJ, guarantee Appellant uniform confinement conditions in different facilities, or that civilian confinement facilities must meet standards or conditions established at military facilities. Having a cell to oneself and being allowed outside a cell for one hour per day do not in themselves amount to a denial of the necessities of life.

It is true that "[d]enial of adequate medical attention can constitute an Eighth Amendment or Article 55[, UCMJ] violation." *White*, 54 M.J. at 474 (citing *United States v. Sanchez*, 53 M.J. 393, 396 (C.A.A.F. 2000)). The standard is "reasonable" medical care rather than "perfect" or "optimal" care. *Id*. at 475 (citation omitted). However, despite Appellant's complaint that he was "in pain" throughout his confinement, Appellant does not allege and the evidence before us does not reflect that Appellant ever requested and was denied medical care prior to 29 March 2022. Accepting as true for purposes of our analysis Appellant's claim that he had an ultrasound on that date, and that Appellant has not undergone surgery for an inguinal hernia as of 27 April 2023, Appellant has not made a sufficient showing he was denied reasonable medical care under the circumstances. For example, he has failed to demonstrate such a surgery is medically necessary in his case.

For similar reasons, Appellant has failed to meet the second prong of the *Lovett* test—that confinement authorities demonstrated deliberate indifference to Appellant's health or safety. As described above, most of Appellant's complaints on appeal do not implicate his health or safety, much less deliberate indifference. With respect to medical care, "[i]n order to state a cognizable claim" of medical mistreatment under the Eighth Amendment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Appellant has not alleged confinement authorities were on notice Appellant had any particular medical need until 29 March 2022, and he has not demonstrated his treatment has been less than reasonable, much less deliberately so.

Finally, Appellant has failed to satisfy the third prong of the *Lovett* test. Despite being advised in writing of the requirement to exhaust administrative remedies, Appellant at no point filed an Article 138, UCMJ, complaint. Appellant claims he had "no way of filing grievances to the Air Force" while confined at ECJ, yet the attachment to the Deputy Commander's declaration indicates he had access to stamps and envelopes. Regardless, Appellant also does not claim he exhausted the grievance procedures at ECJ (or the USDB) with respect to the allegedly deficient conditions; to the contrary, Appellant requested his own cell rather than to be housed with another servicemember.

Accordingly, Appellant has failed to demonstrate he is entitled to relief for the alleged violation of the Eighth Amendment and Article 55, UCMJ.

**H. Appellate Delay**

Appellant's record of trial was originally docketed with this court on 28 July 2021. Appellant requested and was granted eight enlargements of time in which to file his assignments of error, over the Government's opposition, ultimately filing his original assignments of error on 23 June 2022 and a supplemental brief raising an additional issue on 5 July 2022. The Government filed its answer brief on 25 August 2022 after being granted one enlargement of time. Appellant submitted his reply to the Government's answer on 9 September 2022.

On 8 November 2022, addressing one of Appellant's assignments or error, this court issued an order remanding the record to the Chief Trial Judge, Air Force Trial Judiciary, for return to the military judge to correct certain omissions from the record. *Stafford*, 2022 CCA LEXIS 654, at *4. The record was re-docketed with the court on 12 January 2023 with a certificate of correction attaching the missing matters. Thereafter, Appellant was granted two additional enlargements of time before he submitted an additional brief on 15 June 2023, supplementing his arguments with respect to two previously raised issues as well as raising three new issues. The Government submitted its answer on 17 July 2023, and Appellant filed his reply brief on 8 August 2023 after receiving additional enlargements of time.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the [CCA]." *Id*. at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id*. at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious

as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Assuming for purposes of our analysis that the November 2022 remand and January 2023 re-docketing of the record did not "reset" the *Moreno* timeline, there is a facially unreasonable delay in the appellate proceedings. Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights. Appellant has not specifically alleged cognizable prejudice, and we find none. Moreover, we find the delays involved in Appellant's case have not been so egregious as to adversely affect the perception of the fairness and integrity of the military justice system. The delay in issuing this opinion is largely attributable to the time Appellant took to prepare his briefs for this court, and partly due to a two-month remand to correct an error Appellant identified, and in the manner Appellant requested. Accordingly, we find no violation of Appellant's due process rights. Furthermore, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude no such relief is warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court